

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00260-CV

IN THE INTEREST OF C.M.C.,
A CHILD

----------

FROM THE 158TH DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

Appellant Father appeals the trial court's order appointing Stephen Hall, a nonparent and nonrelative, as sole managing conservator of Father's son, C.M.C.[2] Mother, who is not a party to this appeal, was awarded possession the

----

[1]*See* Tex. R. App. P. 47.4.

[2]Although Father was at the hospital when C.M.C. was born, the birth certificate did not reflect Father's name. C.M.C.'s name was legally changed to C.M.B. to reflect that Father was his biological father. We will therefore use "C.M.B." when referencing the child in the remainder of this opinion.

first and fifth weekend of every month, and Father was awarded possession the third weekend of every month, along with other possession at spring break, Thanksgiving, and Christmas break. Father raises two main issues, challenging the appointment of Hall as sole managing conservator of C.M.B. and challenging the possession order. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

C.M.B. was born two months premature on June 9, 2002 in Fort Worth. When C.M.B. gained weight and was released from the hospital, Mother and Father brought him home to live with them. C.M.B. later went to live with Hall and Vickie Murphy, who was Mother's sister. The record contains conflicting testimony about when C.M.B. went to live with Hall and Murphy and whether C.M.B.'s biological parents intended for Hall and Murphy to care for C.M.B. indefinitely.

### A.    Hall's Testimony

Hall testified at the hearing that he had cohabitated for at least twenty years with Murphy and that he and Murphy went to see C.M.B. when he was a preemie in the hospital. While C.M.B. was living with Mother and Father, they hooked up a propane gas tank to a hot water heater and caught the house on fire. C.M.B. was in the house at the time of the fire. Hall believed that C.M.B.'s parents were using drugs and that there was abuse based on Father's criminal background and the area that they were living in.

2

When C.M.B. was a little over a year old, he went to live with Hall and Murphy because C.M.B.'s parents were homeless. Hall later clarified that Murphy went to pick up C.M.B. when Mother and Father went to jail because of a family dispute.

Around 2006, after C.M.B. had been living with Hall and Murphy for approximately three years, Murphy went to court to formalize her custody of C.M.B. After Murphy went to court to get custody of C.M.B., Mother started visiting and asking for C.M.B. to stay with her. Approximately once a month, Mother called and wanted to see C.M.B. Murphy took C.M.B. to visit Mother whenever she asked.

In 2009, Murphy died while C.M.B. was home with her.[3] Hall took care of C.M.B. after Murphy died and was substituted in the custody suit in place of Murphy. Hall testified that he has always made sure that C.M.B. is fed and clothed and medically cared for.[4] Hall said that he had enlisted several different women to care for C.M.B. after school and when Hall was out of town. At the time of the conservatorship hearing, Hall's daughter-in-law and her three-year-old son were living with him, and his daughter-in-law was helping care for C.M.B.

---

[3]The record does not detail the cause of Murphy's death.

[4]Hall testified that he lives in a house that was built in 2000, that he was employed as a field engineer superintendent and was required to travel some, and that his salary was $60,000 a year.

Hall testified that C.M.B. is happy and does well in Hall's care. C.M.B. is a special needs child who rides a special needs bus to a special needs school. His class has five or six students and three teachers. He has been diagnosed with anger management issues and ADHD and has a hard time studying. Hall testified that he does not have insurance for C.M.B. because "it's just very difficult and very expensive" since he is a special needs child, but Hall has paid all of C.M.B.'s medical bills.

Hall said that Mother had lived "a lot of different places" and that Mother's home was not a very good atmosphere for C.M.B. to be in. Hall testified that he fears for C.M.B.'s safety when he is at Mother's house. Once while C.M.B. was visiting Mother, he was bitten by a pit bull that was chained to the back porch. Hall assumed that C.M.B. was fed when he was at Mother's and that she looked after him "[t]o the best of [her] ability."

Hall noted that C.M.B. becomes upset and angry before and after he visits with Mother, that he curses upon his return from a visit, and that his grades drop. Hall said that it usually takes a week for C.M.B. to get back on track after a visit with Mother, and then he starts making hundreds and nineties again. Hall said that C.M.B. kicks and fights and does not want to talk to Mother when she calls. Hall has to hold him.

Hall ran criminal background checks on Father and Mother and saw that Father had been in prison for seven years and that Mother had DWIs and family disputes on her record. Hall said that Mother has a problem of being in abusive

4

relationships; he has seen her with a tooth knocked out, black eyes, and a hurt wrist.

Hall understood that Father was living with Father's mother, agreed that her house was "fairly nice, decent," and noted that she was a good influence on C.M.B. Hall said that he and the grandmother have a "fairly good relationship for the child," that they had worked out a schedule so that C.M.B. could stay with her, and that C.M.B. went to the grandmother's house fairly regularly. Hall felt safe when the grandmother watched C.M.B., and he returned "happy" and "nice." Hall said that C.M.B. enjoyed himself at his grandmother's house and would plant things and play. C.M.B.'s grandmother had him over for a visit during Christmas vacation and brought him back on Christmas Day. She gave Hall a check for $300, which he assumed was for child support, and a $100 bill for C.M.B. for a Christmas present. This was the first time Hall had received child support. C.M.B. called Father and his grandmother the night before the 2009 conservatorship hearing.

Hall testified that he wanted C.M.B. to visit with his family as much as possible but that it would not be in C.M.B.'s best interest to move out of Hall's home. Hall said that his work schedule does not impede C.M.B.'s ability to flourish because he gets special needs help from professionals, psychologists, and professional teachers; "[h]e's getting all kind of help that I can provide for him." Hall asked for full care, custody, and control of C.M.B. even though C.M.B.

is not his child because Hall loves him and has cared for him almost his whole life.

## B.     Mother's Testimony

Mother testified that she and Father broke up after a couple of years because they were not getting along, and according to Mother, C.M.B. lived with her in 2003 and 2004. Mother said that C.M.B. was receiving Medicaid through her. Mother admitted that she and Father fought and ended up going to jail[5] and that Murphy came and picked up C.M.B. Mother, however, denied having ever been homeless and said that she never let C.M.B. live with Hall; she went to get him "on occasions."

Mother admitted that C.M.B. was difficult during her initial visits with him but that other times "he would be so happy." C.M.B. acted out and cursed and kicked, but he also acted at times like a sweet, caring, young boy.

Three years prior to the trial, Mother married Jeff Henry and bought a two-bedroom mobile home in Kennedale. C.M.B. had his own room and his own bathroom.[6] She said that there was food in the pantry and that the house was clean. Mother said that there was no drug use in the house and that she had never "cooked dope."

---

[5]Mother also admitted that she had two DWI convictions and had lost her license for two years in 2002.

[6]Mother testified that she had three children, including C.M.B. Mother's oldest child is an adult, and her middle child lives with her dad. So C.M.B. would be the only child living in her home.

Mother said that her personal income was zero and that she was supported by her husband. At the time of the hearing, Mother was planning to get a part-time job. Mother admitted that she had never paid child support and had never given Hall money for C.M.B.'s school expenses, but she had tried to prove her fitness as a parent by attending parenting classes on her own and by taking two drug tests and passing them.

## C. Mother's Husband's Testimony

Mother's husband, Jeff Henry, testified that he had been married to Mother for three years. Henry admitted that he had been arrested in 1987 for methamphetamines and had been sentenced to eight years in the penitentiary. Henry was also convicted of DWI in 2002. After the DWI and before he met Mother, he "got [his] life together" and "quit doing drugs." He passed the drug tests that he took while the conservatorship case was pending.

Henry said that he treats C.M.B. like a son. Henry said that C.M.B. did not live at the Hall residence; instead, Murphy and Hall had often called because they wanted to see C.M.B.

## D. Grandmother's Testimony

7

Lynda Bisbey, who is Father's mother and C.M.B.'s grandmother, testified that she owns a double-wide mobile home in Fort Worth[7] and that Father lives with her. At the time of the conservatorship hearing, Bisbey was unemployed and was looking for employment; to pay her bills, she relied on support that she received from an inheritance.

Bisbey testified that C.M.B. has never lived with her but that he has visited her house "probably once a month, maybe, or every couple of months." Bisbey said that she picked up C.M.B. from Mother's house or Mother brought him to her; Bisbey never picked up C.M.B. from Hall's house. Bisbey was under the impression that C.M.B. lived with Mother.

Bisbey believed that Father would move out of her house and would rent a place of his own once he became gainfully employed and could pay bills and daycare.

### E. Friend's Testimony

Vicki Smith, who was Murphy's best friend, testified that she met C.M.B. when he was two and was "very disturbed" because he exhibited troubling behavior.

Smith's understanding was that Mother had a long-term drug problem, and Smith also suspected that there was physical violence at Mother's house. Smith met Mother when she was dropping off C.M.B. at Hall's. Smith's interactions with

---

[7]Photos of her home, including photos of her stocked pantry and refrigerator, were admitted into evidence.

Mother were "very much reflective of somebody who really did not -- was not attempting to be adult." Smith had also spoken with Mother on the phone and had gathered that she was not the kind of person who could stay on task or have a reasonable conversation. Smith testified that she thought C.M.B.'s exposure to Mother's environment and Mother's conversation adversely affected his behavior. Smith said that C.M.B. did not like going to visit his Mother. After C.M.B. returned to Hall's home following a visit with Mother, C.M.B. acted out violently, hit adults, cussed incessantly—including calling Smith a "b[----]"—and told everyone around that he hated them.

Smith had less knowledge about Father because she had seen him in person only twice. She stated,

> I think what I have observed that C.M.B. does quite well with him. I have always thought he was a caring person. I never felt that C.M.B. was threatened like I did -- you know, his safety -- his physical safety like I did when he was at [Mother's].
>
> I don't think that C.M.B.'s biological father has the tools to really provide and attend to his special needs concerns.

Smith said that when C.M.B. returned from visits with Father, he appeared to have had a pleasant experience and did not exhibit the same issues as after a visit with Mother.

Smith testified that she had not seen Hall's participation decrease after Murphy died; he continued to attend ARD meetings at the school to find out the game plan for C.M.B.'s educational process. Smith testified that she had never seen C.M.B. malnourished or dirty while Hall has cared for him, nor had C.M.B.

9

exhibited signs of physical or emotional abuse while in Hall's care. She said that Hall was a very good father figure/parent figure for C.M.B. Hall was involved and wanted to understand how to handle C.M.B.'s behavioral problems and what his educational process requires. Smith recommended that Hall be appointed as the permanent father of C.M.B. because Hall is stable and loving and is extremely dedicated to caring for C.M.B.

### F.    Trial Court Disposition

After hearing the above testimony and reviewing the record, the trial court stated that he believed that Hall had carried his burden. The trial court thereafter signed an order appointing Hall as sole managing conservator of C.M.B. and giving Mother possession the first and fifth weekend of every month and giving Father possession the third weekend of every month, along with other possession at spring break, Thanksgiving, and Christmas break.[8] The trial court later made findings of fact, which are set forth below, and this appeal followed.

### III. NO ABUSE OF DISCRETION SHOWN IN APPOINTING NONPARENT CONSERVATOR

In his first issue, Father argues that the trial court abused its discretion by appointing as C.M.B.'s sole managing conservator Hall in lieu of Father. Specifically, Father argues that the trial court abused its discretion in making the conservatorship appointment because several findings of fact were not supported

---

[8]The trial court also ordered Mother and Father to pay child support, to repay medical reimbursement arrearages, and to provide medical support for C.M.B., but those portions of the order are not detailed above because they are not challenged on appeal.

by the evidence, Hall relied on others to do his parenting, Hall did not have consistent parenting help, and Father could provide a nice home for C.M.B.

## A.    Standard of Review

We give wide latitude to a trial court's decision on custody, control, possession, and visitation matters. *Earvin v. Dep't of Family & Protective Servs.*, 229 S.W.3d 345, 350 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)).  We will not reverse a conservatorship finding unless the record demonstrates that the trial court abused its discretion.  *See In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *Whitworth v. Whitworth*, 222 S.W.3d 616, 622–23 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (op. on reh'g).  Under an abuse of discretion standard, challenges to the legal and factual sufficiency of the evidence are not independent grounds of error; rather, they are simply factors in assessing whether the trial court abused its discretion.  *Gardner v. Gardner*, 229 S.W.3d 747, 751 (Tex. App.—San Antonio 2007, no pet.).

In determining whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we engage in a two-pronged inquiry:  (1) Did the trial court have enough information upon which to exercise its discretion; and (2) did the trial court err by applying its discretion?  The traditional sufficiency review comes into play with regard to the first question.  *In re W.M.*, 172 S.W.3d 718, 725 (Tex. App.—Fort Worth 2005, no pet.); *In re T.D.C.,* 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet.

11

denied). With regard to the second question, we determine, based on the elicited evidence, whether the trial court made a reasonable decision. *W.M.*, 172 S.W.3d at 725; *T.D.C.*, 91 S.W.3d at 872.

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994). When findings of fact are filed and are unchallenged, they occupy the same position and are entitled to the same weight as the verdict of a jury; they are binding on an appellate court unless the contrary is established as a matter of law or there is no evidence to support the finding. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Rischon Dev. Corp. v. City of Keller*, 242 S.W.3d 161, 166 (Tex. App.—Fort Worth 2007, pet. denied), *cert. denied*, 129 S. Ct. 501 (2008).

### B. Parental Presumption

There is a strong presumption that the best interest of a child is served if a natural parent is appointed a managing conservator. *Whitworth*, 222 S.W.3d at 623; *see also* Tex. Fam. Code Ann. § 153.131(a) (Vernon 2008). Section 153.131 provides that a parent shall be appointed sole managing conservator unless the court finds that appointment of the parent or parents would not be in

12

the best interest of the child because the appointment would significantly impair the child's physical health or emotional development. Tex. Fam. Code Ann. § 153.131(a).

For the court to award managing conservatorship to a nonparent under section 153.131, the nonparent must prove a significant impairment by a preponderance of credible evidence. *Whitworth*, 222 S.W.3d at 623; *see also* Tex. Fam. Code Ann. § 105.005 (Vernon 2008) ("Except as otherwise provided by this title, the court's findings shall be based on a preponderance of the evidence."); *J.A.J.*, 243 S.W.3d at 616. There must be evidence to support the logical inference that some specific, identifiable behavior or conduct of the parent will probably cause that harm. *Whitworth*, 222 S.W.3d at 623. Indeed, the nonparent must offer evidence of specific acts or omissions of the parent that demonstrate that an award of custody to the parent would result in physical or emotional harm to the child. *Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990); *Whitworth*, 222 S.W.3d at 623.

An adult's future conduct may be somewhat determined by recent past conduct; however, evidence of past misconduct, in and of itself, may not be sufficient to show present unfitness. *Whitworth*, 222 S.W.3d at 623. Specific acts or omissions of a parent implicating a significant impairment to a child's emotional development may be inferred from direct evidence. *Id*. However, this link between the parent's conduct and harm to the child may not be based on evidence that merely raises a surmise or speculation of possible harm. *Id*.

13

**C.    Evidence of Significant Impairment**

Here, the trial court made fifteen findings of fact based on the testimony at trial:

***Findings of Fact – Suit Affecting Parent Child Relationship (SAPCR)***

1.    Vickie Annette Murphy, biological Aunt of [C.M.B.], was the original Petitioner.  However, Ms. Vickie Annette Murphy passed away on January 7, 2009.  She was succeeded as Petitioner by her husband and current Petitioner Stephen Hall.  Respondent [Mother] is the biological mother of the Minor Child.  Respondent [Father] is the biological father of the child.  [Mother] and [Father] are not married and do not live together at this time.

2.    At the time of the filing of his Supplemental Petition, Stephen Hall had been a domiciliary of Texas for six months and a resident of Denton County for ninety days.

3.    This suit was brought by Petitioner Stephen Hall seeking to be awarded custody of the Minor Child.  Additionally, Petitioner Stephen Hall seeks child support, medical reimbursement and clarification of custody and visitation issues.

***Findings of Fact – SAPCR***

4.    At the time of the rendition of the Final Order, Petitioner Stephen Hall was seeking custody of the following child under the age of eighteen years:

> Name:  [C.M.B.]
> Sex:  MALE
> Birth date: 06/08/2002

5.    It is in the best interest of the child that Stephen Hall be appointed the Sole Managing Conservator of the child, with all the rights and duties of a Non Parent Appointed as Sole Managing Conservator as set out in Family Code Section 153.371, which Section is incorporated by reference as if fully set forth herein.

14

6.     There is credible evidence of a history or pattern of past or present child neglect or physical abuse or drug abuse by [Mother] directed against the Minor Child, or done while in possession of the Minor Child and it is not in the best interest of the Minor Child that [Mother] be appointed as Sole or Joint Managing Conservator of the Minor Child.

7.     There is credible evidence of a history or pattern of past or present child neglect or physical abuse or drug abuse by [Father] directed against the Minor Child, or done while in the possession of the Minor Child and it is not in the best interest of the Minor Child that [Father] be appointed as Sole or Joint Managing Conservator of the Minor Child.

## *Findings of Fact – Possession*

8.     The periods of possession vary from the Standard Possession Order for the following reasons:  The Minor Child is a Special Needs Child and has severe emotional and behavior issues.  The Minor Child requires constant care, assistance with administering his medication and help with educational challenges.  Through testimony and other evidence Petitioner has proven himself to be the consummate caregiver and the Minor Child has flourished under his tutelage.  The established rapport that Petitioner has with the Minor Child and the past history of neglect/abuse by [Mother] mandate limited access by [Mother].  The Minor Child is agitated when forced to communicate with [Mother] and the Minor Child is more emotional and behavior challenged when he returns from visitation with [Mother].  Similarly, the past history of extended periods of absence by [Father] created an irreconcilable gap in his relationship with the Minor Child and the Minor Child is having more difficulty returning to his structure at home after visitation with [Father].  The Minor Child will benefit from limited and structured exposure to [Father].

## *Findings of Fact – Grandparent Possession of or Access to Grandchild*

15

9.     At the time of the filing of this request for possession of or access to [C.M.B.], [Father] has not had his parental rights terminated.

10.     Denial of possession or access to the child by his Paternal Grandmother would significantly impair the child's physical health or emotional well-being.

### *Findings of Fact – Child Support*

11.     The amount of child support ordered by the Court is in accordance with the percentage guidelines:

12.     The amount of child support payments per month that is computed if the percentage guidelines of section 154.125 of the Texas Family Code are applied to the first $7,500 of [Mother]'s net resources is $222.56; and

13.     The amount of child support payments per month that is computed if the percentage guidelines of section 154.125 of the Texas Family Code are applied to the first $7,500 of [Father]'s net resources is $222.56;

### *Appointment of Non Parent as Sole Managing Conservator*

14.     The Court finds by a preponderance of evidence and by clear and convincing evidence that (a) the appointment of [Father] would not be in the best interest of the Minor Child because such appointment would significantly impair the health and emotional development of the Minor Child[, and] (b) the appointment of [Mother] would not be in the best interest of the Minor Child because such appointment would significantly impair the health and emotional development of the Minor Child[.]

### *Findings of Fact as Conclusions of Law*

15.     Any finding of fact that is a conclusion of law shall be deemed a conclusion of law.

On appeal, Father challenges only findings of fact number 7, 8, and 14.

However, Father did not challenge the remaining findings of fact, including

finding of fact number 5, which found that it was in C.M.B.'s best interest that Hall be appointed as the sole managing conservator of C.M.B. Nor did Father establish the contrary as a matter of law; instead, the testimony at trial bore out this finding of fact. Consequently, this finding of fact is binding on this court and supports the trial court's judgment. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Rischon Dev. Corp.*, 242 S.W.3d at 166; *In re X.V.*, No. 02-09-00227-CV, 2010 WL 3193168, at *11 (Tex. App.—Fort Worth Aug. 12, 2010, no pet.) (mem. op.) (holding that unchallenged findings of fact that were supported by trial testimony were binding on appellate court).

Moreover, Hall presented evidence that Mother had requested numerous visits with C.M.B. since 2006 when Murphy filed suit to obtain custody; there was no similar evidence regarding any requests from Father to visit with C.M.B. In fact, the record seems to indicate that it was Bisbey, C.M.B.'s grandmother, who requested the visits once a month or every other month and who established a working relationship with Hall and that Father visited with C.M.B. only as a byproduct of Bisbey's requested visits. The record lacked evidence that Father had attended meetings at the school to assist with C.M.B.'s special needs, nor did the record contain evidence that Father had taken C.M.B. to any of his appointments with his psychologist. Hall presented evidence that Father paid no child support during the years C.M.B. was in Hall's custody, and there was no evidence that Father supported C.M.B. in any other way, such as by providing medical care, school supplies, food, clothing, or birthday or Christmas presents.

17

The evidence also demonstrated that Father did not have any income, that he did not have a place of his own, and that he did not have the tools to "really provide and attend to [C.M.B.'s] special needs concerns." Father's future plans, as explained by Bisbey, were speculative and were contingent on Father's ability to obtain employment.

Father did not testify at the conservatorship hearing. The limited controverting evidence that came in via Hall's friend, who had met Father in person only twice, established that C.M.B. did "quite well" with Father, that Father was a caring person, that C.M.B.'s physical safety was not in jeopardy when he visited with Father, and that C.M.B. appeared to have had a pleasant experience when he returned from visits at Bisbey's house where Father lived. However, Bisbey, who would have been able to observe any interaction between Father and C.M.B. while he was visiting at Bisbey's house, did not provide any testimony regarding if or how the two interacted.

The record here demonstrated that appointing Father as managing conservator of C.M.B.—which would require C.M.B. to move and to live with a man whom he visited only once a month or every couple of months and who had shown no ability to pay for or to tend to C.M.B.'s special needs—would significantly impair his emotional development due to Father's extended periods of absence from C.M.B.'s life from the time he was one until he was seven. *See X.V.*, 2010 WL 3193168, at *12 (holding that it was within trial court's discretion to find that appointing mother as the child's managing conservator would

18

significantly impair his physical and emotional development because record disclosed, among other facts, that mother could not financially support son, that she was looking for full-time employment, that she was still working on her home, and that it was best for son to remain in situation where he was thriving); *Lopez v. Dep't of Family & Protective Servs.*, No. 01-08-00111-CV, 2008 WL 4367588, at *7–8 (Tex. App.—Houston [1st Dist.] Sept. 25, 2008, pet. denied) (mem. op.) (holding that it was within trial court's discretion to find that appointing father as the children's managing conservator would significantly impair their physical and emotional development because record disclosed, among other facts, that father was unable to maintain stable employment and housing). Because sufficient evidence exists that appointing Father as managing conservator of C.M.B. would significantly impair C.M.B.'s emotional development, we therefore hold that the trial court did not abuse its discretion by concluding that Hall had overcome the parental presumption by proving that appointing Father as C.M.B.'s managing conservator would cause C.M.B. significant impairment by a preponderance of credible evidence. *See Whitworth*, 222 S.W.3d at 623; *In re Rodriguez*, 940 S.W.2d 265, 272 (Tex. App.—San Antonio 1997, pet. denied) (affirming appointment of nonparent as the managing conservator of the child when child had lived with nonparents since day after her birth, had visited only twice with father, had bonded with nonparents, and had received cards addressed by and presents bought by paternal grandmother; suggesting that significant impairment of emotional development may be inferred from uprooting a child or from

19

placement with parent who has a poor track record for stability and continuity); *In re Hidalgo*, 938 S.W.2d 492, 497 (Tex. App.—Texarkana 1996, no writ) (holding that evidence supported conclusion that appointment of mother as sole managing conservator would significantly impair the emotional development of the child since she had effectively abandoned the child from shortly after birth until she was eleven); *X.V.*, 2010 WL 3193168, at *12; *Heiskell v. Kendrick*, No. 14-06-00972-CV, 2007 WL 3072002, at *4 (Tex. App.—Houston [14th Dist.] Oct. 23, 2007, no pet.) (mem. op.) (holding that sufficient evidence existed to show that father's appointment as managing conservator would significantly impair the children's physical health or emotional development because father had physically attacked mother on a number of occasions, had made only sporadic visits to the children following separation from mother, and had failed to provide adequate financial support for children). Father's arguments on appeal that Hall had relied on others to do his parenting, that Hall did not have consistent parenting help, and that Father could provide a nice home for C.M.B. fall short— especially in light of his failure to testify as to his relationship with and plans for caring for C.M.B.—and do not controvert the fact that Hall had overcome the parental presumption by a preponderance of credible evidence. We therefore overrule Father's first issue.

## IV. POSSESSION AND ACCESS ORDER WAS SUPPORTED BY RECORD

20

In his second issue, Father argues that the trial court abused its discretion by giving Mother more visitation than Father and by denying Father any visitation with C.M.B. on Christmas Eve or Christmas Day.

The public policy of this State is to assure continuing contact between children and parents who have established the ability to act in their child's best interest; to provide a safe, stable, and nonviolent environment for the child; and to encourage parents to share in their child's development after separation or divorce. Tex. Fam. Code Ann. § 153.001 (Vernon 2008). When determining issues related to conservatorship or possession of and access to the child, the best interest of the child is the primary consideration. *Id.* § 153.002; *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).

The Texas Family Code provides guidelines for trial judges to follow when determining the periods of possession for a possessory conservator. Tex. Fam. Code Ann. § 153.192(b) (Vernon 2008). The Texas Family Code also provides that there is a rebuttable presumption that the standard possession order (1) provides reasonable minimum possession of a child for a parent named as a possessory conservator or joint managing conservator and (2) is in the best interest of the child. *Id.* § 153.252. However, the Texas Family Code allows a trial court to deviate from the standard possession order. When deviating from the standard possession order, a trial court may consider (1) the age, developmental status, circumstances, needs, and best interest of the child;

21

(2) the circumstances of the managing conservator and of the parent named possessory conservator; and (3) any other relevant factor. *Id.* § 153.256.

As mentioned above, in determining the issues of conservatorship and possession of and access to the child, the trial court is given wide latitude in determining the best interest of the child and will be reversed only for an abuse of discretion. *In re C.R.T.,* 61 S.W.3d 62, 65 (Tex. App.—Amarillo 2001, pet. denied) (citing *Gillespie*, 644 S.W.2d at 451). This is, in part, because the trial court is in a better position having "faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent." *Coleman v. Coleman*, 109 S.W.3d 108, 111 (Tex. App.—Austin 2003, no pet.). Thus, when the testimony of witnesses is conflicting, this court will not disturb the credibility determinations made by the factfinder. *See id.* A reviewing court's holding that a trial court did not abuse its discretion implies that the evidence contained in the record rebutted the presumption that the standard possession order was reasonable and in the child's best interest. *See Niskar v. Niskar*, 136 S.W.3d 749, 756 (Tex. App.—Dallas 2004, no pet.).

With regard to the age, developmental status, circumstances, needs, and best interest of the child, the trial court specifically found—as set forth above in finding of fact number 8—that the standard possession order was not reasonable and not in the seven-year-old child's best interest for the following reasons: "The Minor Child is a Special Needs Child and has severe emotional and behavior

issues. The Minor Child requires constant care, assistance with administering his medication and help with educational challenges."

With regard to the circumstances of the managing conservator and of the parent named possessory conservator, the trial court had before it evidence that Hall had a job with a steady income and a nice home and that he provided for all of C.M.B.'s needs. Hall was involved and worked to understand how to handle C.M.B.'s behavioral problems and what his educational process requires. The trial court also had before it evidence that Father was unemployed, that Father had not made any child support payments to Hall, and that Father had not actively and regularly participated in C.M.B.'s life from the time C.M.B. was a little over a year old until he was seven. There was no evidence regarding how many visits Father had with C.M.B. after suit was filed in 2007.

Based on the record, the trial court was in the best position to weigh Mother's demonstrated interest in initiating visits and her potentially volatile environment against Father's nice home but lack of visits and time spent with C.M.B. The trial court was also in the best position to determine whether a Christmas Eve or Christmas Day visit was warranted in light of the fact that only Bisbey—not Father—had provided money once for a Christmas gift for C.M.B. Accordingly, we hold that the trial court did not abuse its discretion by entering a modified possession and access order that was in C.M.B.'s best interest. *See In re T.J.S.*, 71 S.W.3d 452, 459–60 (Tex. App.—Waco 2002, pet. denied) (holding that evidence supported variance from standard possession order because,

23

among other facts, eighteen-year-old father who lived with his parents had not seen child since birth, had not asked to see the child, and had not provided financial support nor gifts for child); *see also Elmakiss v. Elmakiss*, No. 12-06-00405-CV, 2008 WL 2358221, at *9–12 (Tex. App.—Tyler June 11, 2008, no pet.) (mem. op.) (holding that trial court did not abuse its discretion by ordering terms of possession that differed from standard possession order because, among other facts, father lacked employment and demonstrated a lack of awareness of child's developmental status or needs).  We therefore overrule Father's second issue.

## V. CONCLUSION

Having overruled Father's two issues, we affirm the trial court's judgment.

SUE WALKER
JUSTICE

PANEL:  GARDNER, WALKER, and MCCOY, JJ.

DELIVERED:  April 21, 2011

24